# EXHIBIT A

Filed 11/20/2025 1:54 PM
Sherry Griffis
District Clerk
Harrison County, Texas
Lori Hightower
Deputy

Cause No. 25-1001

| | |
|---|---|
| The State of Texas; and<br><br>The State of Texas ex rel., JKJ Partnership 2011, LP<br>*Plaintiffs*,<br><br>v.<br><br>Bristol-Myers Squibb Company; Sanofi-Aventis U.S. LLC; Sanofi US Services Inc., formerly known as Sanofi-Aventis U.S. Inc.; Sanofi-Synthelabo Inc.; Sanofi S.A.; and Doe Defendants 2 to 100,<br>*Defendants.* | In the District Court<br><br>71st Judicial District<br><br>Harrison County, Texas |

**Plaintiffs' Original Petition**

The State of Texas brings these consumer protection and healthcare fraud claims against Defendants Bristol-Myers Squibb Company ("BMS"), Sanofi Aventis U.S. LLC, Sanofi US Services Inc., formerly known as Sanofi-Aventis U.S. Inc., and Sanofi-Synthelabo Inc. (collectively "Sanofi Defendants," and together with BMS, "Defendants"). In this action, the State alleges that Defendants unlawfully marketed and sold their prescription antiplatelet medication, Plavix (generic name "clopidogrel"), in a false or deceptive manner, in violation of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code §§17.41 *et seq.* The State specifically alleges that Defendants violated the DTPA by failing to warn Plavix patient-consumers and their prescribing physicians that Plavix had diminished or no effect for many patients, particularly Black, East Asian and/or Pacific Islander patients (hereinafter "Minority Patients"), due in part to the prevalence of genetic variants ("polymorphisms") in the patients' hepatic (liver) enzymes.





Copy from re:SearchTX

Defendants' actions also violated Texas's Health Care Program Fraud Prevention Act ("THFPA"), Tex. Hum. Res. Code § 32.001 *et seq.*, in that they resulted in Minority Patients being prescribed a medication that was substantially inadequate or inappropriate. Because of Defendants' deceit, millions of Texans were improperly prescribed Plavix and had their lives unnecessarily placed at risk. Defendants' actions also wasted billions of dollars from taxpayer-funded healthcare programs like Texas Medicaid, all for the sake of lining Defendants' pockets.

Under Texas law, the Attorney General has the exclusive authority to vindicate rights under the DTPA and has authority to pursue lawsuits under the THFPA, and he, therefore, brings this Petition before the Court. In support hereof, Attorney General Ken Paxton, acting for the State, will respectfully show the Court the following.

## Introduction

Defendants collectively manufacture, market and/or distribute dozens of pharmaceutical drugs in the United States. Their prescription antiplatelet drug, Plavix, has earned Defendants billions of dollars since the drug's launch in December 1998. Beginning in March 1998, and until the U.S Food and Drug Administration ("FDA") insisted that Defendants add a boxed warning to the Plavix label sometime in or after March 2010, Defendants engaged in false, misleading, and deceptive marketing strategy designed to increase revenue from the drug.

Since at least March 1998, Defendants knew or should have known that Plavix has diminished effect on a considerable percentage of patient-consumers, specifically Minority Patients. Despite this fact, Defendants concealed the truth and failed to disclose the negative efficacy information because it would adversely affect the number of Plavix prescriptions written, thus adversely affecting Defendants' sales and revenues. At bottom, Defendants prioritized



Copy from re:SearchTX

profits even if that meant putting patients' lives at risk. Defendants' actions were particularly egregious because certain Minority Patients—Black patients in particular—face disproportionate risk of cardiovascular disease and are twice as likely to die of cardiovascular disease relative to White patients.

Once the scientific community began to learn that Plavix had diminished or no effect on a considerable percentage of the patient population, Defendants again put profits over patient-consumers by inaccurately painting Plavix as a better alternative to aspirin, which is a fraction of the cost of Plavix. In addition, Defendants falsely, misleadingly, and deceptively suppressed and minimized clinical trial data and other information showing that Plavix was in many cases less effective than aspirin in treating patients, and that Plavix has a higher chance of other complications.

Pharmaceutical drug manufacturers cannot get away with putting profits over the health of Texans. The State brings this suit to hold Defendants accountable for their false, misleading, and deceptive trade practices in violation of the DTPA and THFPA and to stop Defendants from ever again putting Texans in harm's way.

## Discovery Control Plan

1. The discovery in this case is intended to be conducted under Level 3 pursuant to Texas Rule of Civil Procedure 190.4. This case is not subject to the restrictions of expedited discovery under Texas Rule of Civil Procedure 169 because the State's claims include a claim for non-monetary injunctive relief and claims for monetary relief, including penalties and attorneys' fees and costs, in excess of $250,000, and the claims are within the jurisdictional limits of the Court.





Copy from re:SearchTX

## Parties

2. Plaintiff the State of Texas is a sovereign state.

3. Relator KJ Partnership 2011, LP ("JKJ") is a partnership formed under the laws of Delaware. JKJ acts as a Relator for purposes of the THFPA claims asserted herein.

4. Defendant Bristol-Myers Squibb Company ("BMS") is a Delaware corporation with its principal corporate offices at 345 Park Avenue, New York, New York 10154 and facilities throughout the State of New Jersey. On information and belief, Defendant BMS has manufactured, advertised, labeled, marketed, promoted, sold, and/or distributed Plavix within the State of Texas.

5. Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability company with headquarters and research facilities located at 55 Corporate Drive, Bridgewater, New Jersey 08807. On information and belief, Defendant Sanofi-Aventis U.S. LLC has engaged in the business of manufacturing, developing, advertising, labeling, marketing, promoting, selling, and/or distributing Plavix in the United States, and has, directly or through and in concert with its co-Defendants, systematically and continuously advertised, marketed, promoted, sold, and/or distributed Plavix within the State of Texas.

6. Defendant Sanofi US Services Inc., formerly known as Sanofi-Aventis U.S. Inc., is a Delaware corporation with offices located at 55 Corporate Drive, Bridgewater, New Jersey 08807. On information and belief, Defendant Sanofi US Services Inc. fka Sanofi-Aventis U.S., Inc., has engaged in the business of manufacturing, developing, advertising, labeling, marketing, promoting, selling, and/or distributing Plavix in the United States, and has, directly or through



Copy from re:SearchTX

and in concert with its co-Defendants, systematically and continuously advertised, marketed, promoted, sold, and/or distributed Plavix within the State of Texas.

7. Defendant Sanofi-Synthelabo Inc. is a Delaware corporation. On information and belief, Defendant Sanofi-Synthelabo Inc. has engaged in the business of manufacturing, developing, advertising, labeling, marketing, promoting, selling, and/or distributing Plavix in the United States, and has, directly or through and in concert with its co-Defendants, systematically and continuously advertised, marketed, promoted, sold, and/or distributed Plavix within the State of Texas

8. Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., fka Sanofi-Aventis U.S., Inc., and Sanofi-Synthelabo Inc. are collectively referred to as "Sanofi" in this Complaint.

9. At all relevant times, Defendants have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted, and purported to warn or purported to inform users regarding the benefits and risks associated with the use of the prescription drug Plavix.

## Jurisdiction and Venue

10. This enforcement action is brought by Attorney General of Texas Ken Paxton, through his Consumer Protection Division (CPD) and Healthcare Program Enforcement Division, in the name of the State and in the public interest, under the authority granted to him by section 17.47 of DTPA and sections 36.051 and 36.052 of the THFPA on the ground that Defendants (1) failed to warn Plavix patient-consumers and their prescribing physicians that Plavix had a weaker effect or no effect whatsoever for many patients, and Minority Patients in particular, and (2) engaged in these alleged false, misleading, or deceptive acts or practices from the time



Copy from re:SearchTX

Defendants first began selling Plavix in December 1998 (hereinafter "launch") until a boxed warning, also known colloquially as a black box warning, was added to the Plavix label at the insistence of the FDA sometime in or after March 2010. Defendants have engaged in false, deceptive, and misleading acts and practices in the course of trade and commerce, as defined in, and declared unlawful by sections 17.46(a) and (b) of the DPTA and section 36.002 of the THFPA. In enforcement suits filed pursuant to section 17.47 of the DPTA and sections 36.051 and 36.052 of the THFPA, the Attorney General is authorized to seek civil penalties, redress for consumers, and equitable relief.

11. Venue of this suit is proper in Harrison County under Section 17.47(b) of the DTPA because Defendants have done business in Harrison County, including but not limited to contracting with businesses and individuals in Harrison County, and under section 15.002(a)(1) of the Texas Civil Practices and Remedies Code because a substantial part of the events and omissions giving rise to the claims in this Petition occurred in Harrison County, including but not limited to individuals' consuming of Plavix in Harrison County.

12. Venue of this suit is also proper in Harrison County under the THFPA's venue provision, Tex. Hum. Res. Code § 36.052(d), which permits suits to be filed "in a county in which any part of the unlawful act occurred." *Id.* Upon information and belief, venue is proper in Harrison County because Defendants specifically targeted prescribers and patients within Harrison County with promotional materials that concealed the fact that Plavix carried risks for Minority Patients.



Copy from re:SearchTX

**Public Interest**

13. The State of Texas has reason to believe that Defendants have engaged in, and will continue to engage in, the unlawful practices set forth below; that Defendants have, by means of these unlawful acts and practices, caused damage to and acquired money or property from persons; and that Defendants have adversely affected the lawful conduct of trade and commerce, thereby directly and indirectly affecting the people of the State of Texas. Therefore, the Consumer Protection Division of the Office of the Attorney General of the State of Texas believes and is of the opinion that these proceedings are in the public interest.

14. Similarly, because Defendants' actions resulted in the submission of millions of claims to the State's healthcare programs for prescriptions of Plavix that were obtained under false premises, the Healthcare Program Enforcement Division of the Office of Attorney General of the State of Texas believes and is of the opinion that these proceedings are in the public interest.

**Trade and Commerce**

15. Defendants have, at all times described below, engaged in conduct that constitutes "trade" and "commerce," as those terms are defined in section 17.45(6) of the DTPA.

**Conditions Precedent**

16. All conditions precedent to the State's claim for relief have been performed or have occurred.



Copy from re:SearchTX

## Acts of Agents

17. Whenever in this Petition it is alleged that Defendants did any act, it is meant that Defendants performed or participated in the act, or that its officers, agents, or employees performed or participated in the act on behalf of and under the authority of Defendants.

## Statutory Background

18. This case involves two important Texas statutes that were enacted by the Legislature to prevent fraud on Texans and on Texas's taxpayer-funded health insurance programs.

19. Section 17.46 of the DTPA explicitly outlaws "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce."[1] Applicable to Defendants' actions is section 17.46(b)(5) which defines "false, misleading, or deceptive acts or practices" to include, but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."[2]

20. Section 36.002 of the THFPA explicitly prohibits actors from "knowingly present[ing] or caus[ing] to be presented a claim for payment under a [Texas-funded] health care program for . . . a product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or a product that . . . is otherwise inappropriate."

[1] Tex. Bus. & Comm. Code Section 17.46(a).

[2] Tex. Bus. & Comm. Code Section 17.46(b)(5).



Copy from re:SearchTX

## Factual Background

### A. The science behind Plavix.

21. Plavix, whose generic name is clopidogrel bisulfate (hereinafter "Plavix" or "clopidogrel"), is an oral antiplatelet medication in tablet form. "Platelets" are cells that circulate in the bloodstream and bind together—aggregate—to form clots when a blood vessel is damaged. Antiplatelet medications are designed to inhibit the aggregation of platelets when the formation of clots is undesirable, such as when a patient has recently suffered a heart attack or stroke and is at risk of another adverse event if the formation of clots is not prevented.

22. The formation of clots in the blood vessel of a patient who has recently suffered a heart attack or stroke, or who suffers from other cardiovascular conditions such as peripheral artery disease ("PAD"), can have catastrophic, and often fatal, consequences. This is especially true for patients who have had metal stents placed in their arteries for the purpose of revascularization, via a procedure called "percutaneous coronary intervention," or "PCI," in which clots can both form and cause fatal blockages. The purpose of antiplatelet medications like Plavix is to reduce the risk of such recurrent adverse events by inhibiting platelet aggregation.

23. Plavix is what is known as a prodrug. Unlike most medications, which are active when ingested, a prodrug must be activated by the patient's body, usually by enzymes in the patient's liver ("hepatic enzymes"), but sometimes by enzymes elsewhere in the patient's body or other mechanisms of action. If, for any reason, the patient's body fails to bioactivate the prodrug, it is effectively a placebo and remains inert within the body until it is eliminated, in which case the patient receives none of the risk reduction or other benefit intended. If the patient's body only partially activates the prodrug, the patient may, to a greater or lesser degree,



Copy from re:SearchTX

receive only partial benefit or risk reduction, which may be insufficient to prevent an adverse event.

**B. <u>The process to receive FDA approval.</u>**

24. Plavix is a prescription drug, and like all prescription drugs its marketing, sale, and prescription are subject to regulation by the FDA. The FDA determines the approved uses (indications) to which a prescription drug may be used, and under what circumstances it can be prescribed. The FDA also issues regulations that impose various obligations on a drug manufacturer regarding labeling and marketing of a drug, as well as post-market surveillance of a drug to detect new or more serious problems with the drug than were detected during the clinical and preclinical trials leading up to FDA approval.

25. To obtain FDA approval of a new drug, a manufacturer or other sponsor must file a New Drug Application and subject the drug to a series of preclinical and clinical trials. Preclinical trials involve study of the drug *in vitro* or in animals. Clinical trials involve study of the drug in humans. Clinical trials ordinarily consist of three phases: (a) Phase I, a study of the drug in a relatively small group of healthy volunteers or patients with the disease/condition over a period of several months in order to determine the appropriate dosage for the drug, how it should be given, and how it affects the body; (b) Phase II, a study of up to several hundred patients with the disease/condition over a period of several months to two years in order to evaluate the drug's efficacy and side effects; and (c) Phase III clinical studies, which are often referred to as pivotal clinical studies because they are the studies upon which the FDA bases its final determination of whether the drug is safe and effective for human use and for the indication that will be on the





Copy from re:SearchTX

drug's label. Phase III studies are large, usually thousands of patients, and are complex and expensive to perform.

### C. Plavix's clinical trials revealed no benefit to minimal benefit to patients.

26. The Phase III trial for Plavix involved a combined head-to-head comparison of Plavix to aspirin for the treatment of three different cardiovascular conditions: myocardial infarction ("heart attack"), ischemic stroke, and PAD. The trial is known by the acronym "CAPRIE" (Clopidogrel versus Aspirin in Patients at Risk of Ischemic Events).

27. In CAPRIE, Plavix was compared to aspirin because aspirin is also an antiplatelet medication. Aspirin has proven effective in reducing cardiovascular events in patients with a recent heart attack or stroke. From 1997 and on, aspirin was considered the standard of care antiplatelet agent for prevention of arterial thromboses.

28. The results of the CAPRIE study showed Plavix had only a marginal overall benefit over aspirin across the three cardiovascular conditions studied. For patients who enrolled in the trial on the sole basis of a recent heart attack, Plavix was numerically inferior to aspirin. The CAPRIE study showed a significant relative risk reduction for study participants with PAD (23.7%), but the risk reduction was less significant for study participants who had suffered a recent stroke (7.3%) and was less significant than aspirin for those who had recently suffered a heart attack (-4.0%). As a result, Plavix was not approved for the primary prevention of a heart attack, stroke, and/or PAD and was instead approved only for the secondary treatment of patients who had already suffered a heart attack or stroke or who had previously been diagnosed with PAD. This approval was issued on November 17, 1997.

29. Racial disparities existed in Plavix's clinical trials.



Copy from re:SearchTX

30. When Defendants were seeking approval to conduct the CAPRIE clinical trial they made a commitment to the FDA to study the effects of race during the trial. Yet, when the study was conducted Defendants included only 5% non-Caucasians. Nevertheless, as relevant here, the CAPRIE trial did detect a statistically significant disparity in the number of adverse events suffered by non-white racial groups.

31. This racial disparity in the response to Plavix was contained in Defendants' January 13, 1997 internal report of the CAPRIE study ("CAPRIE Report"). However, the medical article about the results of that internal trial that was released by Defendants' Plavix Steering Committee for publication to the broader medical community ("CAPRIE Article") omitted any mention of this statistically significant racial disparity. As a result, outside scientific researchers were denied this important information, which likely impeded the evolution of the science in this area.

32. In February of 1997, Defendants completed an internal report, "MIH0012," which revealed that three Cytochrome P450 genes were principally involved in the metabolism of Plavix within the body, specifically the isoforms CYP2B6, CYP2C19 and CYP3A4. CYP2C19 was genetically polymorphic and its polymorphic nature prevented the activation of other drugs, thereby inhibiting any effect of Plavix. Non-Caucasian individuals have the highest rate of CYP2C19 poor metabolizers.

33. In March of 1998, after FDA approval but prior to Plavix's launch into the commercial market, Defendants completed a meta-analysis of internal data regarding Plavix ("1998 Meta-Analysis"). The 1998 Meta-Analysis found that almost one-third of Plavix patients



Copy from re:SearchTX

(32.2%) had less than 20% response to the drug and 3.4% did not respond to any pharmacological tests used ("poor responders").

**D. <u>Defendants mislead users about the true nature of Plavix.</u>**

34. The finding that Plavix had a poor responder problem was not shared with the FDA until 2005, seven full years after the conclusions were known to Defendants. To add insult to injury, this information was placed hundreds of pages into an appendix of another document. Even when the information was eventually disclosed to the FDA, it was buried in a large volume of other documents to obscure the lengthy delay in its disclosure, as well as its findings.

35. In November of 1998, Defendants completed an internal report, "MIV0265," which confirmed the results of MIH0012 that CYP2C19 was one of the enzymes principally involved in the metabolism of Plavix within the body. Defendants launched the sale of Plavix to the public in December 1998. In addition to the results of the 1998 Meta Analysis, Defendants knew at least the following at the time of launch:

a) Plavix is a prodrug;

b) Plavix is bioactivated by enzymes in the patient's liver;

c) The enzymes necessary to activate a prodrug are often produced by a gene group known as Cytochrome P450 (each one of which is identified by an alphanumeric designation beginning with CYP);

d) Per Defendants' internal reports, CYP2C19 and CYP3A4 were two of the Cytochrome P450 genes principally involved in the metabolism of Plavix within the body.





Copy from re:SearchTX

e) CYP2C19 is and was known to be genetically polymorphic, *i.e.*, it had several different variant forms, some of which might potentially be able to activate a prodrug and some of which might not.

f) CYP3A4 is not polymorphic with respect to the activation of Plavix;

g) in other drugs known to be metabolized by CYP2C19, the polymorphisms of CYP2C19 had been shown to be less effective or to have no effect in activating the drug;

h) more than four years before the launch of Plavix, CYP2C19 polymorphisms were shown to interfere with the metabolization of drugs, for example in an anticonvulsant prodrug named S-mephenytoin;

i) the team of researchers who demonstrated the adverse effect of CYP2C19 polymorphisms on the metabolism of S-mephenytoin (hereinafter "de Morais Team") developed a simple PCR-based laboratory test to identify the CYP2C19 gene and its genetic polymorphisms;

j) in the published article regarding their study, the de Morais Team explained how to conduct their CYP2C19 PCR-based genetic test in a clinical setting, concluding the PCR-based genetic test for the defective CYP2C19 allele: "will be useful in clinical studies investigating the importance of this genetic defect in drug metabolism in humans;"

k) the CYP2C19 polymorphisms that were shown to have an impaired effect on the metabolization of S-mephenytoin (loss-of-function alleles) were known to





Copy from re:SearchTX

be significantly more prevalent in East Asians than in other major races by as much as five-fold;

l) every individual has two CYP2C19 genes, one from each parent, both of which may be normal or one or both of which may be mutations (abnormalities) or alleles (normal genetic variations);

m) in two additional studies conducted by de Morais, CYP2C19 polymorphisms accounted for 100% of Japanese subjects who were "poor metabolizers," *i.e.*, who could not properly metabolize the drug (S-mephenytoin);

n) there was a group of poor responders to Plavix; and

o) Plavix patients who are poor responders, and therefore do not receive the intended antiplatelet effect, are likely at a higher risk of a recurrent heart attack or stroke than those who are not poor responders.

36. The lack of a uniform patient response to Plavix of the kind that was revealed by the 1998 Meta-Analysis was first called "Plavix resistance." Given the potential severity of the cardiovascular conditions Plavix was intended to guard against, the discovery that this drug was not working as intended for almost one-third of patients—and particularly patients who are disproportionately affected by cardiovascular disease—was a matter that would be of great concern to patients and physicians and should have been of great concern to Defendants. But Defendants did not take it as such.

37. Defendants did not bring this information to the FDA's or the public's attention, or actively conduct research in an effort to understand the problem and correct it; nor did Defendants try to warn the public or the FDA about the risks associated with Plavix resistance.





Copy from re:SearchTX

Instead, Defendants, through their public conduct and words, clearly showed that they were intent on receiving money at the cost of patients' welfare.

38. Throughout the first decade that Plavix was on the market, Defendants repeatedly tried to position Plavix in the marketplace as superior to aspirin and other antiplatelet medications, particularly with respect to recent heart attacks. Despite repeated warnings from the FDA's Division of Drug Marketing, Advertising, and Communications that Plavix could not be marketed as superior to aspirin, Defendants continued to mislead patient-consumers by claiming that such superiority existed.

39. Further, aware that Minority Patients are particularly susceptible to cardiovascular disease, Defendants specifically targeted such patients with promotional materials for Plavix, including TV commercials featuring Black actors.

## Causes of Action

40. Through their conduct and its effect on Texas citizens, Defendants have engaged in deceit and have misled patient-consumers in marketing potentially life-saving medication. Defendants have violated the DTPA and THFPA and must now face the consequences.

### COUNT 1 - Violation of Tex. Bus. & Comm. Code § 17.41, *et seq*.

41. The State re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

42. The DTPA prohibits all false, misleading, or deceptive acts or practices in the conduct of any trade or commerce.



Copy from re:SearchTX

43. Defendants, as alleged herein, have in the course of trade and commerce, engaged in false, misleading, and deceptive acts and practices declared unlawful by sections 17.46(a) and (b) of the DTPA, including:

A. Failing to disclose information—including the fact that Plavix has diminished or no effect on a significant percentage of the patient population;

B. Failing to disclose information—including the fact that in Plavix's labeling and otherwise, Plavix has a greater chance of causing complications than aspirin;

C. Failing to adequately disclose information— including Plavix's true efficacy and safety profile in the drug's labeling, sales materials, and other promotional materials and efforts;

D. Falsely and misleadingly marketing Plavix, in Plavix's labeling and otherwise, as more effective and safer than aspirin;

E. Falsely and misleadingly marketing Plavix, in Plavix's labeling and otherwise, as more effective and safer than other competitor drugs; and

F. Falsely and misleadingly marketing Plavix, in Plavix's labeling and otherwise, as effective and safe for uses for which the drug had not been shown to be effective and safe.

44. Under the DTPA, the State may seek a temporary restraining order or permanent injunction, and also may obtain a civil penalty to be paid to the State in an amount of up to $10,000 per violation.



Copy from re:SearchTX

**COUNT 2 - Violation of Tex. Hum. Res. Code § 36.001, *et seq*.**

45. The State re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

46. Defendants knowingly committed multiple unlawful acts as defined in the applicable version of THFPA § 36.002, including the following:

A. Defendants knowingly caused the making of claims under Texas-sponsored healthcare programs for a medication that was substantially inadequate or inappropriate when compared to generally recognized standards within the health care industry. Defendants did so to receive benefits or payments under the Texas Medicaid program, which payment was made in whole or in part by Texas Medicaid and other Texas healthcare programs. In doing so, it violated Tex. Hum. Res. Code § 36.002(7)(B)-(C).

B. Defendants knowingly conspired to commit a violation of Tex. Hum. Res. Code § 36.002(7). *See* Tex. Hum. Res. Code § 36.002(9).

47. The State seeks recovery of the value of all payments and/or benefits provided under Texas's healthcare programs, including the Medicaid program, as a result of Defendants' unlawful acts, together with pre-judgment and post-judgment interest, pursuant to THFPA §§ 36.052(a)(1), (2).

48. The State seeks civil penalties for each unlawful act committed by Defendants that did not result in injury to an elderly person, or disabled person, or a person younger than 18 years of age, pursuant to THFPA § 36.052(a)(3)(B).





Copy from re:SearchTX

49. The State seeks an additional two times the value of payment(s) and/or benefit(s) unlawfully received by Defendants, pursuant to THFPA § 36.052(a)(4).

50. The State requests the Court enter an order pursuant to THFPA § 36.051 permanently enjoining Defendants from committing further unlawful acts.

51. The State seeks fees, expenses, and costs reasonably incurred by it in obtaining civil remedies or in conducting investigations in connection with this litigation, including court costs, reasonable attorney fees, witness fees, expert fees, and deposition fees pursuant to THFPA §§ 36.007, 36.110, and Tex. Gov't Code § 402.006(c).

**Trial by Jury**

52. Plaintiff herein requests a jury trial and tenders the jury fee to the Harrison County District Clerk's office pursuant to Tex. R. Civ. P. 216 and Tex. Gov't Code § 51.604.



Copy from re:SearchTX

November 20, 2025

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

Respectfully submitted.

*/s/ Amy S. Hilton*

**AMY SNOW HILTON**
Chief
Healthcare Program Enforcement Division
Texas State Bar No. 24097834
Amy.Hilton@oag.texas.gov

**ANTHONY DOLCEFINO**
Assistant Attorney General
Healthcare Program Enforcement Division
Texas State Bar No. 24134406
Anthony.Dolcefino@oag.texas.gov

**KATHERINE PITCHER**
Assistant Attorney General
Healthcare Program Enforcement Division
Texas State Bar No. 24143894
Katherine.Pitcher@oag.texas.gov

Office of the Attorney General
Healthcare Program Enforcement Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 936-1709
Facsimile: (512) 499-0712

**COUNSEL FOR TEXAS**



Copy from re:SearchTX

*/s/ Sam Baxter*
Samuel F. Baxter (co-lead counsel)
sbaxter@mckoolsmith.com
Jennifer L. Truelove
jtruelove@mckoolsmith.com
**MCKOOL SMITH P.C.**
104 East Houston, Suite 300
Marshall, Texas 75670
(903) 923-9000

Eric B. Halper (*pro hac vice* to be filed)
ehalper@mckoolsmith.com
John C. Briody (*pro hac vice* to be filed)
jbriody@mckoolsmith.com
Radu A. Lelutiu (*pro hac vice* to be filed)
rlelutiu@mckoolsmith.com
Ayana Rivers (*pro hac vice* to be filed)
arivers@mckoolsmith.com
1301 Ave. of the Americas, 32nd Floor
New York, New York 10001
(212) 402-9400

Rachael Jones
rjones@mckoolsmith.com
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000

*/s/ W. Mark Lanier*
Mark Lanier (co-lead counsel)
WML@LanierLawFirm.com
Alex J. Brown
Alex.Brown@LanierLawFirm.com
Zeke DeRose III
Zeke.DeRose@LanierLawFirm.com
Jonathan Wilkerson
Jonathan.Wilkerson@LanierLawFirm.com
**THE LANIER FIRM, PC**
10940 W Sam Houston Pkwy N Suite
Houston, Texas 77064
(800) 723-3216

**COUNSEL FOR PLAINTIFF THE STATE OF TEXAS and JKJ PARNERSHIP 2011 LLP**



Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 108289899
Filing Code Description: Plaintiff'S Original Petition
Filing Description:
Status as of 11/20/2025 3:02 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| denise lopez | | dlopez@mckoolsmith.com | 11/20/2025 1:54:35 PM | NOT SENT |
| Angel Devine | | adevine@mckoolsmith.com | 11/20/2025 1:54:35 PM | NOT SENT |
| joel leach | | jleach@mckoolsmith.com | 11/20/2025 1:54:35 PM | NOT SENT |
| Rick Halper | | ehalper@mckoolsmith.com | 11/20/2025 1:54:35 PM | NOT SENT |
| john briody | | jbriody@mckoolsmith.com | 11/20/2025 1:54:35 PM | NOT SENT |
| Jennifer Truelove | | jtruelove@mckoolsmith.com | 11/20/2025 1:54:35 PM | NOT SENT |
| Radu Lelutiu | | rlelutiu@mckoolsmith.com | 11/20/2025 1:54:35 PM | NOT SENT |
| Sam Baxter | | sbaxter@mckoolsmith.com | 11/20/2025 1:54:35 PM | NOT SENT |

Copy from re:SearchTX